which I'm missing. Is Larson vs. AT&T? Thank you for your help. Oh, no problem. It's important. This is an incredibly difficult matter. I called this Larson, but Larson is no longer with us. How do you pronounce the name of the class applicant here? It's Gallegulos. Gallegulos? Gallegulos. Gallegulos. It's a Spanish pronunciation. Double L. Okay. Good. I want to thank also for bearing with us. It's been a very long day for you folks, and you did not go out to get lunch, which might mean your argument will be a lot shorter than it otherwise would have been, but thank you very much for your patience in this. Thank you, Your Honors, and good afternoon. I'm Scott Bursar for the appellant, Lina Gallegulos et al., and I'll be reserving seven minutes for rebuttal. Can you forgive me if I refer to her as the plaintiff? Sure. Okay. And we were actually the objector in the court below, and the issue here is we had a class action settlement that we objected to, and one of the primary grounds of our objection was that the settling parties did not comply with the requirement of Federal Rule of Civil Procedure 23C2B that requires individual notice. Let me focus on that. I know there are a number of challenges, some of which your opponents say are waived, but as far as the individual notice under Rule 23 is concerned, as I read this, maybe I'm missing something, and I don't pretend to be an expert in statistics. In fact, I changed minors in college so I wouldn't have to take it and teach it to myself afterward. But I cannot imagine that there's not a statistical sampling method that could give you an idea of how many people there are in the sprint record base without going through and actually doing fatalities. I understand that. Maybe I should ask the opponent this. I understand that the reason that the court thought that it wasn't reasonable, it was going to be too unduly burdensome, was because to do that, to give individualized notice, was because sprint argued the only way to find out how many members were in that actual class was to go through and actually do the individualized record inquiry, which to my mind is kind of like saying the only way to determine how many people vote for candidate X is to have the election. And we all know that's not true. Am I missing something? And did you put on evidence to HILSEA where to suggest that there were statistical methods by which you could take a sample size, however that is, and there are formulas to determine it. In fact, on Google, I found 18 last night. It would tell you how many people to put into that sample. Take a random sample of that sample and determine from that how many people in this class would be actual payors. We did do that, Your Honor, because we were in the unique position of having litigated this issue in a state court case in California. And in our state court. And you used that sample. You used the Robertson sample. We used it. It was a Robertson sample and the IAD sample. And at page 26 of our opening brief, we used that information to calculate how many people likely would be identified through the billing databases. But I think the issue here is really much simpler than that because regardless of how many people would have been identified, and it's undisputed that it would have been in the millions, in the millions at least. And it's undisputed that there are tens of millions of members of this class. Those facts are not in dispute. But the key fact here is however many people would have been identified from those billing databases, the effort should have been made to do it. Can you respond to the district court's observation that you were anything but shy about bringing up problems, and yet you waited, what, more than four months to actually say anything in opposition to the death sentence declaration? I mean, why shouldn't we accept the district court judge's decision that you waited too long to make this point? The reason, Your Honor, is because we filed our objection on the deadline when it was due, when the judge ordered us, on the date that was ordered. The sequence of events was we objected initially and said the notice here was defective for several reasons, including a lack of individual notice. The district court made a ruling that said that's correct. There was a problem here. I'm ordering the parties to redo the notice. He didn't order them to confer with us or, you know, it's just I'm ordering the parties to submit an amended notice plan. The parties submitted an amended notice plan on May 21. And then on June 2, yeah, on June 2, 12 days later, with two weekends in there, seven business days in there, there was no notice of motion, no deadline set. There was just an order approving it. And the order approving it said if anybody has an objection to it, the day to file the objection is October 7. So to say seven business days for not responding to something that wasn't even a notice motion, where no deadline had been set within seven business days constitutes a waiver, I think is unprecedented. There's no support for that. Well, is the court saying that it was a waiver because he didn't do anything in seven business days or saying that waiting four months and then dropping the bomb on the very last day, that's problematic? Well, either way, Your Honor, once June 2 comes and we see the order approving the amended notice plan, part of that order says here's the schedule. If you have an objection, October 7 is the day, not only for us but for the entire class. And so we followed the judge's order. The judge's order didn't say I'm approving this notice plan, and if anybody thinks I'm wrong, they should come in and move for reconsideration of this order right now. The order didn't say that. So we got an order from the judge that said if you have a problem, October 7 is the day. October 7, we were there right on time. We filed our objections in writing. And October 21, when the final approval hearing came, we were right on time then too. I stood up in the district court and said here's our problem with the notice plan, here's our objections to the rights declaration. It was the very first words out of my mouth at the final approval hearing. So it was not incumbent on us to file early, and I've yet to see authority for how filing on time, in advance of the final approval hearing, can constitute a waiver. Certainly the two cases that were cited in the brief don't support that. Can I get you to turn to the adequacy of representation argument here and address the standpoint? So you just don't have a basis to make the argument about current subscribers? We don't have a basis to make the argument about the lack of notice or about the inadequacy of representation because – Inadequacy of representation. Right. Well, Ms. Galelos, Mr. Horencian, and the other objector were current subscribers as of the time that this settlement was being negotiated, and they're within the settlement class. And so if they're settlement class members, which there's no dispute they are because the settling parties contend that their claims are released. If you're a member of the settling class, you have standing to make an objection to the settlement. And that includes, for example, Your Honor, obviously parties who get notice, even though they got notice, they have standing to object to the inadequacy of the notice as to other class members. Otherwise, you'd never have an objection. You'd never have an issue about the notice raised because the only people with standing to assert it wouldn't have gotten the notice. So I don't think that argument has any merit whatsoever. Let me see. Maybe you can help me out. What would be the point of current class members objecting to the notice so that more people can be notified and join the class to participate in an already determined settlement, which is only going to dilute the share that everybody's going to get? Well, the issue here with the current subscribers, Your Honor, is that the plaintiffs in the underlying suit that was being settled were all former subscribers. They had all paid a termination fee to Sprint and so had terminated their service with Sprint. Now, the objectors that I represent. They're all subject to the current settlement that's been approved. Right, but other people also, but they settled not only on behalf of those people, but also on behalf of current subscribers. Now, the issue with current subscribers was the settlement gave a release to Sprint to continue with the charges, which amounted to roughly $60 million a month. So that Sprint in the future can go ahead and charge early termination. Correct, correct. Well, if that's true, I mean, would it be appropriate for the district court judge in looking at your argument to say, look, if we were to include the relief that I think you're saying would have been included had there been a current subscriber representative there, that is, don't charge ETF to current subscribers, that could scotch the whole thing because then Sprint stands up and says that's a breach of contract that sinks the entire deal. Well, Sprint could make that argument, Your Honor, but one of the underlying facts of this case was that this termination fee had been proven to be illegal in a state court case in California. But you're moving away from my question. Regardless of what happened in California, my take on what the district court judge was doing, at least thinking about this, and correct me if I'm wrong on this, is that there is this breach of contract counterclaim potential out there, and that impacts the kind of relief the class can legitimately look for and expect to get, and it's what makes this settlement fair. And what I'm trying to get at is doesn't that impact the adequacy of representation piece of this as well? In other words, if the one thing you're saying, hey, we should have gotten if we'd had proper representation, is a form of relief that Sprint would never have agreed to because it would vitiate their breach of contract defense, is it really fair to say that there was inadequate representation? Yes, because the parties who were negotiating the settlement for the plaintiffs had no interest whatsoever in stopping those ongoing charges. Being former subscribers no longer subject to the charges, that relief would have no value to them, although it may be of great value to the current subscribers like my clients. And so in settling the case for $14 million and no prospective relief, when there was $60 million a month ongoing, month after month every month, they traded that away because it had no value to them when an adequate class representative who was part of that, who was having those charges being imposed on an ongoing basis, would have done that calculus differently, or at least would have had an interest in doing it differently, would have said, no, we're not going to give you a license to charge $60 million a month going forward in exchange for merely $14 million. Well, you said it was illegal, I guess under California law. Why was it consented to? I would consent to something where the court approved something. A practice that was illegal, or was it just the fact that the flat rate of the charge had been changed so it was no longer an illegal penalty? No, Your Honor. It had been proven illegal in state court in California. That decision was up on appeal at the time this settlement was approved. It's since been affirmed. These flat fees are illegal in the state of California. And they were not changed by the terms of this settlement. People who were subject to these flat fees at the time of the settlement remained subject to them after the settlement. And that's something that none of the named parties to the underlying case that was being settled had any interest in at all. And so they had no reason to value that or to weigh it or to demand the remedy. They had no standing to seek a remedy. What happens to this case if we agree with you that further notice is required and there are some two or three, maybe more, million class members who could be notified or should have been sent a notice? What happens to this case? Your Honor, if the court agrees with that, that the notice was not consistent with the requirements of Rule 23, number one, I think this court has to vacate the district court's order approving the settlement because the district court lacked jurisdiction. And then the second thing that's going to happen when it goes back down is that it will probably be impossible for the parties to consummate this settlement on these terms because the class is so large and the amount of cash in the settlement fund is so small that the cost of giving the individual notice will deplete the funds. Spring has to put more money in the kitty. Or this isn't the deal. Maybe that's why they're arguing the individual notice is not reasonable. It's absolutely that is the crux of the argument, Your Honor, because if they have to give individual notice to this class, they cannot settle the case on these terms. Is the result in California pertinent in this case? In other words, that Sprint had a much larger counterclaim that it prevailed on than the class members had. That's actually not being a washout. It is relevant under the Gersh factors, Your Honor, and it is relevant in terms of the license to continue the charges that have been proven illegal. But the factual premise of Your Honor's question is incorrect. The class members' award in the state court litigation in California was actually $73 million greater than Sprint's counterclaim award. It was $299 for us and $225 for them. I thought it was $73, $220, something like that. No, we got $299. Sprint had a counterclaim for $225, and their counterclaim was vacated. I looked at the wrong figures. They can straighten it out. So we were up $73 million until the counterclaim was vacated. In post-trial proceedings right now, we're ahead $299 million, and that much of the case has been upheld on appeal. Okay. Your Honors, may it please the Court, Joseph Boyle from Kelly, Dry and Warren, on behalf of Sprint, and I have 10 minutes, and class counsel will take five. I'm going to address the notice issue. I think it's important, first of all, to address Your Honor's point. Mr. Rice, in his declaration, explained that the statistical sampling or whatever else other method might work would first require Sprint to write a program for its billing databases to figure out who was charged the ETF. So, Joseph, I thought you had, maybe I'm confusing witness, but one of the witnesses to me was Weir, had a database, and I assume it was the same database we have here, which had an account type heading on it, which was able to break out types of accounts, but wouldn't that identify who was charged the ETF? A couple things, Your Honor. Mr. Weir's declaration was stricken from the record below. Mr. Weir, as I understand it, and Mr. Weir put his declaration in after the October 7th deadline, and what he was examining, as I understand it, is a database that was created in the California litigation to come up with a list of subscribers. So what you had, at least a part of that, was a list that was created for a litigation that was made searchable for that litigation. So you're telling me that Sprint does not have anywhere a list of its past and future, its past and present subscribers? It has a list of its subscribers. It doesn't have a list of its past subscribers who paid an ETF. Okay, well that's my point. If you take a list of subscribers and do a random sampling the size of which I have no idea, and burrow down into the details of that sampling, you can then determine within that sample how many people paid an ETF and extrapolate that to the entire universe. That seems pretty elementary. But it doesn't get you a list of names and addresses to whom to send individual notes. Why not? Because if you confirm that 60% of the people in here did it, or 70%, maybe you'd make a judgment that says we ought to just send it to the whole class. We ought to send it to everybody. It's more cost effective. Why doesn't knowing the percentage who paid ETF have an impact on whether it's reasonable or not to give notice to that whole database? Well, first of all, I'm not certain that the court didn't know. I don't know anybody focused specifically on the number of people who paid, the percentage of overall subscribers versus the numbers who paid an ETF, but numbers were thrown around about the size of the class. So there was some knowledge on that point. But at the end of the day, the standard under the rule is that can be reasonably identified. So you have to be able to identify the people to whom you want to send a notice. And that includes time and effort and expense? Exactly. And the court didn't explain why time and effort and expense made this individualized notice unreasonable. Well, I think, number one, Your Honor, there is a little bit of gaming the system that goes on with Mr. Bursar's situation. He comes into the original fairness hearing. There's a four-day fairness hearing. Experts are put on the stand. He puts an expert on the stand about notice. Most of the hearing is about notice. The judge agrees with his position, vacates, will not approve the settlement. And that's a pretty strong term. If you haven't done enough sprint, this is not adequate. It goes through and specifically, looking at case law in detail, says you have not done enough. Go back and do it again. And then when you come back with the right declaration saying it's too expensive, he goes, yeah, it's too expensive. Well, no, no, no, that's not completely accurate. We did, number one, do a new mail notice to all current subscribers, 16 million people. We mailed to the Robertson class. We mailed to the Smith class.  But you don't disagree, do you? I mean, at least your opponents have positioned it as being agreed to, that the number of the settlement class who were charged in ETF could reach into the tens of millions, that the search of the billing records as outlined in the rights declaration would result in identification of millions of settlement class members, that a search of the billing records for class members who were charged in ETF would cost $100,000, and that, in fact, you didn't do any search of billing database to identify class members who've been charged in ETF. They pose those things as essentially admitted, are they? Essentially they are, Your Honor. And if you do the math on that, and they have, I think, saying, if you assume two million are in that database, then it's five cents a person. To get to people who are supposedly right in the sweet spot of this class action, people who are facing or charged ETF, why is five cents a person for people who are directly impacted by what the relief here is supposed to do, why isn't it worth five cents a person? Well, Your Honor, first of all, I'm not sure I agree with the math on the five cents a person. I don't know that that's an accurate analysis of the Rice affidavit. But it would have been good if the court had told us that, though, if the court disagreed with those numbers, and that was the reason for ejecting individualized notice. But remember, what Mr. Rice did was he explained how the billing systems were kept and what would need to be done to pull this stuff out, right? He said you've got to write a program to go back and find people who are charged the ETF. And he put a number on that. He said it would be 100 grand to do that. And he also said it would take time. Now, one part of the reasonable analysis, Your Honor, is additional time. So, again, he says you can go from April to June. More than five months, right? But I don't know that that yields you the $2 million figure, Your Honor, because all she's talking about is picking up subscribers from April 1, 2009 to June of 2009. They're mixing apples and oranges when they tell you that Rice could have gotten all of those people in the three-month period. Rice goes through staged analysis. He says that's what it would take to get from April 109 to June 109. You could go back a little further, and you could get more people from this period to this period. That would take even more time. So the judge is going to balance a few things, right? He's going to balance anticipated result, and he's going to balance the amount of time it will take. And what reflects that the judge did that? What he's got is a judge's order that says it's too expensive. Well, number one, we put all that stuff in. Mr. Bursar had notice of it. They didn't respond. So here's the judge. Wait, wait, wait. Don't move to the waiver point. Answer the substantive point. If the judge doesn't receive opposition to the notice plan. He still has an independent obligation. That judge, regardless of whether anybody else objects, still has an independent fiduciary obligation to make certain that it is a fair and appropriate settlement which adequately addresses the release that's going to be given on behalf of the whole class, doesn't he? He does. And the Rice Affidavit explains a process that the judge examined, was not contested by anybody when he approved the amended notice plan, and he made a determination that's reviewed on an abuse of discretion, that going through that entire process was not reasonable. Now, was he provided with an opposing affidavit during his deliberative process that would have told him, here's why it is reasonable. Here's what you need to do that's more. No. They filed a declaration after the objection deadline that utilized an inapplicable. They filed it on the objection deadline. I think the Weir Declaration, Your Honor, which is the one that was stricken, was stricken because it was filed after October 7th. But they didn't file an objection. Okay, well, that's important. They made an objection, well, unless they're just flatly misrepresenting. On October 7th. The point they have pressed repeatedly is, we filed our objection to the Rice Declaration on the due date for objection. Right. They made an objection to the hearsay content, not to the factual content of the affidavit, only that it was based on hearsay on the 7th. In footnote 4 of the opinion, the Court says, the Court declines to consider any submissions, including supplemental declarations, filed by objectors after October 7th. This Court's June 2nd order made it clear that all objections to the settlement were due by October 7th. He then goes through and notes what he's excluding. So let's, for purposes of our conversation, let's accept that they were too late in coming forward. Let's go back to the substance of this. Having already said, and, in fact, in pretty express terms, when rejecting the initial notice plan, the Court said, Sprint needs to do more. The fact that not every member of the class can receive the best notice does not mean that everyone gets the least notice. Rather, those subclasses capable of reasonable identification require individual notice. This especially holds true in a case such as this one, where those who paid an ETF are entitled to recover the lion's share of the settlement, but are generally unlikely to be current Sprint customers, period. Okay, so there's a flat statement that the people who are entitled to really benefit from this are probably past Sprint customers, and you've got that in your database. Then he says, go do it right. Then Mr. Rice says, it's too expensive for us to look at our past folks and to pull this information out, even though potentially millions of people are in there. And the judge's response to that is, I agree. There's not an analysis. There's nothing that shows that he looked at that in light of what his initial ruling was. How are we supposed to assess the quality of the discretion exercise when the order is essentially, yeah, too expensive? Well, number one, Your Honor, you have the Rice Declaration now. And in our notice plan, we said at the end, if the court believes it will be reasonable for Sprint to engage in any of the further efforts set forth in the Rice Declaration, Sprint is willing to do so. However, the dates for the final hearing, final approval hearing, and the exclusions and objections deadlines would have to be pushed out by at least a few months. So we did not say flat out, this cannot be done, which, by the way, isn't the standard. It's a reasonable effort. So we didn't say in the Rice Declaration, it cannot be done. We said this is what must be done in order to do it. But the reason for this foreshadows or includes results. And in determining what's reasonable, you have to also look at what is the likely yield of your efforts. And if the yield is only minuscule, clearly an expensive undertaking that's time-consuming is not going to be reasonable. But if the yield is going to be perhaps tens of millions of class members, especially if those class members are, as Judge Jordan said, in the sweet spot of the complaining members here, what's reasonable is going to look very, very different. Well, I understand that, Your Honor. But what happened here was we made a proposal to the court that included what we believed. It was just actually an analysis of what needed to be done. And we laid it out there, and we said, for example, to get April 1, 2009, to June 30, 2009, so what is that, three or four months, it would cost approximately $20,000, and it wouldn't be done until September 1, 2009, assuming that there were no system errors. And then we said, okay, if you want to go back as far as April 1, 2007, to March 31, 2009, it would push out the completion date of the analysis to December 1, 2009. My problem is that, and again, it's not what I would have done, what any of us would have done, but whether or not what the district court did was reasonable and whether it was an abuse of discretion. But if you have someone telling you, even with all the problems of that rights declaration, assuming they were legion, reading the declaration, in fact, and the deposition, you wonder whether or not the guy was even employed there. A lot of stuff he did not know he was relying upon. I guess the company was or whatever.  Amdocs. But why not then take a very small sampling that wouldn't cost all that much, see how many class members you get out of that sampling, and then you know whether or not it's reasonable to go back, how far back you should go, and if you can determine that for every month you delve in, you can reap another 750,000 class members, it may be reasonable to do it. If every month you go into, you're only going to yield another two or three members, it probably is not reasonable to do it. And nothing like that was done, and the district court didn't explain to us why it wasn't reasonable to require something like that before determining that individualized notice that's not here was not required under Rule 23. Well, remember, individualized notice was given, and new notices were sent out as a result of the inquiries that were made. In other words, we did go get the Robertson list. We did get a bunch of other lists. We did send out additional notice. Sure, but it's conceded, it has to be conceded because it's the law, that individual notice is vastly preferable to publication notice. Without question. And that there are potentially millions of class members in this database, right? Yes, without question. So, you know, I guess there could be argument, and we've heard some of it, and we've seen it in the briefing, about just how much it would cost and how much time it would take to get at those millions of people who are concededly in the class and would be entitled to, as Eisen says, individual notice because that's a bottom line requirement of the rule. But without the district court actually going through that process and saying reasonable or not reasonable, just accepting one side's assertion that it's unreasonable, aren't we kind of put in a bad posture to say that was an exercise of discretion, especially in light of the district court's earlier comments about the importance of notice to a former customer? Where's the fairness to the tribunal in this process? Because Mr. Bursar obtains the order to which you just referenced. After four days of an evidentiary hearing and putting an expert on, he receives a copy of the notice plan, but – Please don't take me to whether he did his job right or not. I'm not trying to talk to the waiver point. I understand that district court judges have a very difficult job. It's no small thing to steer one of these class action ships into court. I don't gainsay that for a second. We're just trying to focus on the specific standard of review we have, abuse of discretion, and the pretty strong language from cases like Eisen and Oppenheimer Fund and our own cases like Greenfield, which talk about how highly important it is that, to the maximum extent feasible, individual notice be given. If the only thing we've got to go on is an acceptance in one sentence, essentially, that because Mr. Rice says it's too expensive, it's too expensive,  consistent with the fiduciary-like obligation imposed on the district court. I don't agree that that is what the judge – I don't agree that that's what Mr. Rice said. He didn't say it was too expensive. He told them how much it would cost and how long it would take. The judge took that information and weighed it and said, that takes too long, that costs too much. Nobody challenged those assertions. Filings weren't made to cause the district court to have to do more than say, I can look at this and I agree. You're going to expand who you're giving direct mail notice for, good for you, but I'm not going to make you go beyond that because I read the Rice declaration and I am fine that that is the analytical framework to show me that more is not reasonably necessary. As a practical matter, is Mr. Bursa right in indicating that if this class were expanded  I don't want to put you in an awkward spot. Maybe you can't answer that question. It would be nice to know what the drivers are. There's a few drivers here, but number one, the money is going to have to be expended to do the search, not mailing. I understand you can't raise expenses when it comes to the mailing. If they're identifiable, they've got to be mailed to. I get that. There is going to be money to search the databases. There's going to be time. Rice says that. Nobody argues with those issues. So that money will come out of the common fund and will have to be paid for. It will deplete the common fund. Will it scuttle it? No. There will be a mailing cost. I don't know how many. Millions? Probably. Maybe a million more postcards or notices go out, 30 cents a mailing. Will that scuttle the settlement? I doubt it. But are we in a situation where we've allowed an objector to lie in the weeds and have a district court judge say, I don't accept Mr. Bursch's statement that he wasn't prepared and ready to object to that notice plan at the time it was filed. So the district court judge says there has been gamesmanship here, and that now the district court judge is going to be put in a position that because of that gamesmanship, the district court will be second-guessed. I'm not doing what we do in an adversarial system, which is one side says X, the other side comes in and says Y, and the judge deals with it. If my colleagues will indulge me, if we're going to talk about the adversarial system, then you need to speak to the argument that the plaintiffs are making, or excuse me, that the objectors are making, that we had the amended notice plan filed, and seven business days later with no statement by the court at all, it's approved. It, like, dropped on us like a rock. And who knew? What's your response to that in the context of the fairness of the adversary system? Absolutely. Absolutely. File a motion for reconsideration. We're not going to start the process of mailing the day after that order comes out. He gets the order, and he now knows, hey, he bought Rice, Hook, Line, and Sinker. This is what's going out. I've got to do something about this. So then would you concede that issuing the order in that context is problematic? Not at all. Then why say that a motion to reconsider is the right thing? I mean, if it's approved before there's any kind of notice to the objectors that now I'm not only considering it, I'm ruling on it, how is that an appropriate process? Oh, there was clearly notice to the objectors. They're on the ECF system. They come down. They do the litigation. They get the order. I mean, notice to them that now that the amended plan is in, I'm going to decide. I'm going to rule on it. I mean, wouldn't you sort of expect something from the district court that said, okay, it's filed. Any response to the amended notice plan, if you've got objections to it, let me know by date X because I want to rule on it. Well, I mean, Your Honor, in these fairness hearing situations, the docket becomes a lot more like a bankruptcy case because you have objectors filing who aren't, you know, they're not a plaintiff, they're not a defendant. People use the docket as notice. So if I come in and I say, here's my amended notice plan, Your Honor, please approve it, and Mr. Bursar admits that he gets the amended notice plan after it's filed but before the approval is given. He reads it. It's all in the statements or in the opinion, and he does nothing. Okay, maybe he's got an argument. You know what, I wasn't asked to object, so I didn't. Then he sees the amended notice plan is approved based on the Rice affidavit. He's already taken Rice's deposition. He's in the game 100%, and he does nothing. He now knows the notice is going out. It's going out all over the place, and he's going to wait until October 7th, and he's going to come in and, number one, submit that with the deadline in the court order, October 7th. If he had filed, I know there's some dispute now about whether he filed, but if he had filed it on October 7th, which is the deadline that the court set, assume that for purposes of discussion. Isn't he entirely within his rights as an advocate to do that just that way?  Because he knows that the 7th is the deadline that arises after the notice goes out. A notice plan he knows he's going to object to the minute he sees the Rice declaration. But if the court sets the deadline, if he meets the deadline, how can he be held to have waived his objections, filing within the time the court sets for filing objections? Because, well, in my view, as a participant in the first round of the litigation, on notice, on the docket of what the notice plan is, he has an obligation to come forward if he's going to make an objection to notice. Now, keep in mind, his guys already got notice. They already know about everything that's going on, so he's coming in essentially to scuttle the settlement. Mr. Bursar was counsel for the Verizon settlement, a similar settlement nationwide in California for not very different dollars, and I doubt whether the notice plan, nearly as robust as what is being contended, should be used. I'm sure there's all kinds of... Maybe we want to. But in this circumstance where, as you say, a district court judge needs to pilot the ship into port. Well, then don't put October 7th. I'm saying as soon as possible. But it is troubling. There's someone, no matter how recalcitrant they may be in doing it, if they get an order that says, if you don't like this, come in here by October 7th, they come in by October 7th and the judge says, you didn't get here until October 7th, too late. And it's almost like you're going to March. Well, remember... New business. The October 7th deadline is because new notice is going out. So presumably that deadline is out there. I understand it applies to Mr. Bursar's clients. I'm not arguing it doesn't, but it's there for people who are going to get the new notice, right? They're going to be told, you're getting this notice, you have some objections, show up on the 7th. Now, to me, it is to elevate form massively over substance. If somebody who's already in the case, already has notice, has an objection to the notice plan, and can lie in wait, not having been harmed by the new notice plan whatsoever, his clients already got notice, he's there, can wait and come in on the 7th and raise notice as an issue. So the assertion is, even when the district court says, object by October 7th, you have an obligation to object before October 7th, and can be held to have waived if you object on the deadline for objection. That has to be your position, right? Yes, and I think that was Judge Linares' position, too, which is that you can, if you know somebody who's reasonably relying on a fact that you know to be incorrect, you can be held to have waived or be stopped from challenging that fact. Now, do you have any case at all, or authority, for the position that somebody who files on the day objections are due has waived their right? Obviously, I'm not going to have a case that says that. But what I do have, Your Honor, I think is, again, the way that these things work, the fairness hearing process is a little bit different than your straight-out, normal litigation, right? And so, for example, you have the All Writs Act's power. You can take cases from around the country and draw them all up into your case. And you have a docket that's getting hit with stuff all the time. People are writing letters in. It's busy, it's challenging, you get all that. Well, no, really my point is I think a litigant in that case knows that when they see something hit the docket, they're not waiting around to be told, and the motion will be returnable the next day, and you need to do this, you need to do that. So you're saying there's a custom practice, and he didn't abide by the custom practice, and responsibly show up earlier. That's, in essence, the picture. Without doubt. But also, I think importantly, with respect to the merits of the October 7th challenge. The October 7th challenge was to the hearsay in the Rice Declaration. The challenge on the numbers was past the October 7th deadline, and was a declaration that was excluded by the district court, which he did not appeal. So now your honors are going to be in a position, if you consider the Weir Declaration, which is I think where those numbers came from, and he included in the record, you are going to be relying on a declaration that the district court excluded. Okay. Can you turn to the question of adequacy of representation for a minute? You made the pitch that the objectives here don't have any standing to raise this point, but the Supreme Court's Devlin case, they're telling us, hey, we're undeniably members of the class, and Devlin essentially tells us that gives us standing. How are they wrong? Well, because of what their relief is, right? What they wanted to come in, and what Mr. Bersert said, is I wanted an injunction preventing the collection of flat-rate EPFs on a going-forward basis. Well, as of December of last year, we don't collect EPFs. We don't have contracts with flat-rate EPFs that would be subject to this class definition. So if you were to remand it and send them back in and say you've got to negotiate on behalf of these folks, their issue's moved. It's gone. Well, how do we know that if it's not in the record? I mean, we've got to deal with the record that's before us, right? Okay. There's an injunction as part of the Fairness Settlement that says Sprint will not enter into contracts with flat-rate EPFs for a period of two years. I believe it's December of 2008, so that would make it December of 2010, or in January of 2011. So the people that were subject to a flat-rate EPF that would want to go in and get an injunction to prevent the collection of them wouldn't get the injunction. They wouldn't have a claim. There's no standing for them to be here. There's no remedy this court can grant. Now, with respect to… Well, stick with me because it might just be that my blood sugar level is going through the floor. I'm not sure, but I just didn't follow you there. Their pitch, if I understand their pitch, it is that there's a hole in this relief that past customers are okay, but the current customers, they're not being taken care of, and nobody had an incentive to look out for them and get them covered by a prohibition on gathering in the EPF. And what you're saying, and therefore they say there's inadequate representation because current customers will be found, but no one was looking out for their interests as to the EPF. That's how I understand the argument. Do you agree with me that that's their argument? That is a part of their argument. There's kind of two elements to their argument. One is that one, and the other is they wanted to go in and demand an injunction to prevent the collection of the flat rate EPFs on a going forward basis. So that piece of it I just think is moot. We're not collecting it. So let's go back to the other piece. If that's their argument, and it's true that there's nobody who's in that position,  in making the pitch that they just articulated in their briefing up here at the podium for Mr. Bursar, why isn't that, why does that not represent a fundamental problem with the representation of the class? Well, Your Honor, I think a couple things. Number one, there's been no evidence that that was not part of the mix in the negotiations. And what Judge Linares said was Sprint came in clearly in a negotiating position, and part and parcel of their willingness to do the deal or not do the deal was based upon the fact that they were not going to give up the right to collect the EPFs on an ongoing basis. They weren't going to do that. But that doesn't really seem to answer the point. That's a way of saying there's not going to be a deal here. And maybe that's true. Maybe there isn't a deal. But you can't say, can you? Well, people who have an interest in not being charged EPFs because they're current customers, they don't really get a seat at the table because they might scotch the deal. Well, remember, if the interest in not being charged an EPF, if they terminate the contract, they're charged an EPF, they're part of the class. So the interest in not being charged the EPF could only be to enjoin its enforcement on a going forward basis, which is not a remedy that could be given today. It wasn't a remedy that Sprint would ever agree to.  I don't find the current members of the current representatives to be antagonistic to those people. They don't have to be antagonistic. That's not the standard. The standard under In-Rank Community Bank is they have to have an incentive to push for something, right? Not that they have to be antagonistic to it. But if I remember In-Rank Community Bank, there's three pieces. One is there can't be a conflict of antagonism. And the very first one is you have to have an incentive to pursue the relief that will benefit that bunch of people. And Mr. Bursar is pressing on us the idea that, yeah, absolutely, if this portion of the class that would be bound by this order were actually represented by somebody standing up for them, they wouldn't say, yeah, and don't worry about us. You can go ahead and charge us EPFs. They'd say, no, we haven't been charged yet, but we want to make sure you can't charge us. We want the same kind of blessing that these other guys who got charged and got hit for it. We want to prevent the harm from hitting us. And maybe I've read too much into his argument or I misunderstand it, but that's what I understood him to be saying. And that's what I'm trying to dry out on what's the comeback on that. Well, number one, there were provisions made for current subscribers in the settlement. So there is evidence in the record there were people who had an interest and incentive to negotiate on their behalf. Just because they didn't suffer the exact same injury doesn't mean they didn't have an incentive to negotiate on their behalf. And this goes to the conflict issue. In other words, they didn't sell out the current subscribers to be able to do a deal for the previous subscribers. Current subscribers and previous subscribers recover under the settlement agreement. But current subscribers who haven't yet been charged in ETF, are they bound in any way by this settlement? Yes. And all their claims are released, right? Correct. So that Sprint then can charge them an ETF down the road and they've got nothing to say about it, right? Your Honor, I think they would become a member of the settlement class, and that was the way the settlement agreement was. They would take under the settlement the same way the settlement class did for people who were charged. So assuming there's anything left in the settlement, right? Right. Assuming there's anything left in the settlement, they get something. But if there's nothing left in the settlement, they're sunk, right? Well, I think the way the settlement is structured right now, Your Honor, there's not going to be a distribution that they wouldn't take from. For example, because we're up here now, right? There's no distribution until the final approval hearing is done. What you're telling me is, you're telling me prospective relief wouldn't work, there'd be no deal, and you're telling me that people shouldn't worry about whether they get prospective relief, even if they're bound by this settlement, because if they do get hit with an ETF, at that point, they could try to get money out of the settlement fund. And if they don't get hit with an ETF, they have no damage. Right. But if they do get hit, then they can try to get money out of the settlement fund. And they're in the exact same situation as anybody else who paid an ETF and were adequately represented by those who did. Except for if it doesn't happen to them until they're someplace down in the future and the pie's already been divided up, they're not exactly in the same position, are they? Well, I'm not sure how it would – remember, part of our prospective relief was we're not charging flat rate ETFs after December of 2008, so there was protection for them in that sense, right? So there's not going to be a possibility. They're either in the class because they terminate and get paid, or they're not in the class, but they don't suffer any damage. And the reason there is because it's time-limited as it's 2008, it's not going to be an ongoing problem, and they won't be left out in the cold. Exactly. And it was two years in 08, and it's now – it would have run in December of last year. Thank you. Thank you. Mr. Cecchi? Cecchi, Your Honor, thank you. Very briefly on the adequacy of representation, Judge Jordan, absolutely, in our judgment, class counsel, it's a canard that there was no incentive, that there was no relief given to the current subscribers back then. The whole issue here with the counterclaim and these ETFs is because you have an illegal penalty, and I'll address his comment that it's been declared illegal, you still have a potential damage counterclaim, right? The trial answered three questions. It's docket 160. There's three questions the jury answered. How much ETF was collected? $73 million. Did the class breach its contract with Sprint? That's question two. Yes. Three, how much damage did Sprint sustain as a result of the class's breach of the contract? That's question three, docket 160. It's $225 million, a damage claim in California of $150 million against the class. Goes to fairness, of course. As to adequacy, one of the issues here in the way we structured the settlement, different tranches depending upon when you terminate it, because the defendant argued in these cases that if you terminate on day one, I've invested in these heavy, these expensive handsets, so I've suffered more damage when you terminate on day one than when you terminate on day six. So what is the relief the current subscribers got? They got pro-rated. That's exactly what they wanted. That's exactly what every settlement against the four major carriers provided. Pro-rated. So if they canceled, they got pro-rated. They participate in the settlement just like anybody else. If they don't pay, they can collect the settlement relief just like anyone else who didn't pay. Hold on a second. Sure. Is it the case that, and I apologize for walking backwards slowly, but that's how I got it. And I'm talking fast because I'm having a sugar issue. Is it the case that there is no current subscriber who is a class representative? Two answers. First, the answer to your question is no. No. Thank you. Thank you. Okay. No. There's a class representative named Bechtol. The second answer is yes. You said two answers. No, but the second point that I would make is there's a Bechtol who was a class rep who was a subscriber. He represented the contract extender people who say they illegally got extended, and they had a contract. Was that the notice? That's the Dean short. They're gone. Well, that appeal is gone, but Bechtol was a class rep, and he received a class incentive fee, so Bechtol was in the case. You don't want to dig into that, do you? No, I don't. Digging into that, we start arguing about is it really meaningful to have a class representative who shows up after the deal has been struck. If we don't have to go there, I don't want to go there. Do you want us to go there? Judge, I think you're cute. We don't have to go there. All right. So just starting from the baseline, it's true that there's no class representative who is a current Sprint subscriber. Is that a true or not true statement? It was true at the time of the settlement, and it is true today that there are no current subscribers subject to a flat rate ETF. Okay. So if that's true and that there is some, but they are members of the class and would be bound by this settlement, right? The subscribers back at the time of the settlement who had a flat rate in their contract but had not terminated, yes. Okay. Explain to us the flaw in the objector's reasoning when they say to us, those people stand in a different position from past subscribers. And no one's got the incentive that they do to insist on prospective relief so they don't get hit with one of these. Or for that matter, to make sure that they could actually stand on an equal footing with everybody else in the event they are charged. The interests of the people who were subscribers terminated and were charged and did not pay or were terminated and paid are exactly the same as the current subscribers who have a flat rate ETF in their contract. Say that again. There's three tranches. Subscriber who is a current subscriber who has not terminated, hasn't paid, hasn't been charged in ETF, right? Those people are just subscribers. They have the phone. They have the contract. But their claim is, well, I'm subject to this potential illegal penalty and potentially $200 is a penalty. It doesn't adequately represent the quantum of damages that Sprint would legitimately sustain if I terminated and breached my contract as was found in California. The other people are subscribers who terminated, were charged in ETF and didn't pay, subscriber who was charged in ETF and paid. I submit to Your Honor, and I believe Judge Damaris accepted this argument, that they all have the same exact interest. What is it? The interest is to say, okay, that ETF of $200 is a penalty because it doesn't have a relationship to the quantum of damages that Sprint would sustain. So what is the relief I can get as a subscriber? I can get prorated because if I terminate on day one, damages are different than if I terminate at the end. So what we provided for them, because the interests are the same, is prorated. And, Judge George, they stand exactly the same. It's not as if these subscribers are different. Explain. How are they exactly the same? They say, oh, no, no, no, no. They're different because, well, I'll tell you. We know from Mr. Burson. It's the same because they're prorated now. They're prorated. And this is a canard. Sprint agreed not to impose flat-rate ETFs as of December 2008. And there are two-year contracts. There are no more flat-rate ETFs. That was prospective relief that our class reps obtained that we obtained. So I submit to your honor, it is just not, in our judgment, respectfully, true that there's a divergent interest or that their interests are not the same. We got the exact relief that they could get. Now, remember, these are people who have the contract, haven't done anything. Presumably haven't been damaged in any way yet other than the fact that they're exposed to this potential harm. But they may have hung on to the contract longer than they otherwise would have. Exactly. Let me respond to something else that you touched on. And that is you asked Judge Jordan and I believe Judge Fuentes and Judge McKee in another way did as well. Well, what was his duty when Judge Linares, when the amended notice plan was filed? Where does the duty arise of this objector to come forward and say, hold up, don't spend the money. Or, by the way, Rice's declaration is not accurate. You should go do it. You should do more. Where does the duty arise? First of all, the order that the opinion, the first opinion. Now, remember, there's a 70-page opinion, which I submit is a very intelligible opinion. It's a 70-page opinion, and then there's a 40-page opinion first. The 40-page opinion, he did not move for reconsideration of that. He did not move in response to that. So we filed that amended notice plan in response to Judge Linares' first opinion, which was a consequence of the objections he raised. Under our local rules, Local Rule 7, if there's a filing on the docket, which is notice, you have a duty. You have a duty under Local Rule 7 to say, wait a minute, that proposed form of order is no good. Don't act. You absolutely, and as a proposed fiduciary, as a representative of his client, Allen Goulos, he had a duty to act because that's what that amended notice plan was about. Didn't the district court define the duty about putting a deadline date into the order? Wasn't that the parameter of the duty? Judge, I would submit that the October 7th deadline date related to new objections, because when you look at the second opinion after the fifth day of hearings, when you look at the second objection, nothing in that order that says new objections. It says if you've got an objection, show up on 10-7, right? It absolutely does, Judge. But when you read the opinion, what it says is I'm not going to hear the same old objections. I'll hear new objections. We get to the second – we get to the fifth day of hearings, and I want the record to be clear here at oral argument. There is no evidence that these objectors put in to contradict Rice. And Judge Linares' opinion carefully described it in his second opinion. He says, look, even if I were to revisit what I did after the Rice declaration got submitted, you haven't given me anything. You didn't ask for discovery in a timely way. Weir, its footnote – I'll tell you the footnote. It's in Linares' second opinion where he strikes Weir. It was not filed on time. There is no evidence that they submitted to say, okay, Rice is wrong or they could do more, anything like that. So you have a situation where the judge respectfully – he really went full throttle to satisfy the due process rights of these objectors. He gave them four days of testimony hearings, another day of testimonial hearings, and they gave him nothing. They gave him absolutely nothing at the final day or when the Rice declaration was filed. So where does the duty arise? I say he has it under Local Rule 7. As a putative fiduciary, I say he has it. Candor to the tribunal – he knew Judge Linares was going to rely upon it. He absolutely knew that, and Judge Linares found that in his opinion. I say he had a duty to speak about that Rice declaration. Before the deadline that the court set for speaking about the Rice declaration. I recognize the – let's call it a – That's 22. Yeah, a tension between the positions, but the context of this case is important. And I want your honors also to know in the context of fairness, context is important. This is one of four cases against all the major wireless phone carriers. He settled one against Verizon in California for $23 million, $21 million for 90 million people. This case was for $45 million, I think Judge Linares concluded. $17.5 million in consideration. When you look at the fairness of this settlement, it's right within the wheelhouse of all of these settlements. He had a case against T-Mobile, which came to this panel on a different issue, but it was affirmed. Didn't object to the fairness of consideration. Didn't object to the fairness or consideration of the AT&T settlement. And when you look at the counterclaim, and I urge your honors to do it, it's docket 160. This class was exposed to real risk, not hypothetical risk. A lot of times when lawyers who have class settlements come before your honor or a district court, they say, well, there's risk. It's hypothetical because you have to describe what – we know what happened. The argument that the class recovered is belied by the record. So we knew what the risk is here, and we achieved this settlement after five months of negotiation with Judge Politan. There were objections lodged. Judge Linares gave him four days of testimonial hearings. I say that whole context gives rise to a duty to act. I recognize the points that your honor raises about the October 7th deadline. I submit that was for additional objections not related to – You should have put that in the order, though, and that's what you meant. I can't. So on the adequacy of rep, I've made my point. He raised the point about class definition. He absolutely waived that in my judgment respectfully. He never raised that below in five days. He had plenty of opportunity. In terms of the evidence, what Judge Linares had to form about Rice, et cetera, it was just Rice. That was it. He didn't put in any other evidence. So unless your honors would like to hear a dissertation about the Gersh factors or why this was – the fairness was sufficient, I'm happy to answer any other questions because I do want to say we were part of the settlement, albeit it's not perfect. They never are. We believe that Judge Linares really worked hard, and your honor, Judge, you recognize the difficulties that she really worked hard. So we were proud of the result we achieved, and we would urge your honors to affirm. Thank you. Your honors, I want to clear up three mistakes of fact that have been presented from the podium by Mr. Boyle and by Mr. Checkey. The first correction I want to make is both Mr. Checkey and Mr. Boyle have said several times that we were late with our objections to the Rice Declaration, that we did not file them on October 7th. That's incorrect. Well, I think more specifically, you showed up on October 7th and objected, and Elijah, here's the objection, but you didn't come up with any affirmative evidence of your own for Weir Declaration until after that, and that was too little too late. That's false. That's false. Which part of it? If you look at the part that we only objected to hearsay and that we didn't present our own evidence. At page 22 of our opening brief, we quote verbatim the objection we made on October 7th. The objection was that Mr. Rice's declaration is based entirely on double and triple hearsay filtered through lawyers. The declaration is inadmissible under Rule 601, lack of confidence, 602, lack of personal knowledge, 701, opinion testimony by lay witness, 702, expert testimony by witness lacking qualifications, and 802, hearsay. On October 7th, we also presented additional evidence, which is reflected in the chart at page 24 of our opening brief. On October 7th? On October 7th. We submitted the chart that's at page 24 of our opening brief. This is cut and paste verbatim from our October 7th objection, and what it showed was that based on the internal sprint customer cancellation fee collectability analysis, we showed the number of identifiable class members and the amount of ETF chargers they had at stake and added those two columns to Mr. Rice's declaration to say, to Mr. Rice's summary, to say if you do what Mr. Rice says, this is how many people you will identify. We did that on October 7th. There was an error in our analysis. We said that you would identify 9.2 million people because that's how many termination fees Sprint collected. Now, what we came back with after the deadline. We got the government and the business. Right. And so Mr. Weir said, I can sort those out in five seconds, and that's what we filed late. All we did was correct what we filed on October 7th. But the fundamental litany of objections to Mr. Rice's testimony, and I think anyone who reads his deposition testament as quoted in our brief will agree that this was not someone who had personal knowledge. This was not someone who was competent to testify to the matters that he was testifying to. But we didn't just make those objections. We said if you accept Rice's estimates, here's how many people you will identify. Now, we did overstate it, and we came back and corrected it. The second inaccuracy from Mr. Boyle and Mr. Chackie that I want to correct is this business that the current subscribers. Hold on before you go on. Is it accurate that in coming forward with affirmative evidence from your own guy, Mr. Weir, that that post dated October 7th? That is accurate, yes. Because, Your Honor, on October 7th, we put in something that was overstated because we included it. Where did the $9 million come from? That was Weir? The $9 million, Your Honor, came from, if you look at footnote 4 of our brief, we had a document from our case that showed how many ETFs Sprint collected on each month. Okay, and then later, we said in five seconds, I was able to separate individual, corporate, business. That internal document had everybody. And these fellows came back, I think it was October 17th, and they said the objectors are wrong because that document has everybody in it, not just the individual accounts. And so then I had Mr. Weir, two days later, submit a declaration that was about two pages long that says it took me five seconds on a laptop computer to sort it, and here's the correction. It took Mr. Weir five seconds to do that. Why did it take you four months to file? Because I filed on the day Judge Linares told us the filing was due. And that's your best answer, is knowing that notice was going out, everything was happening, even though your guy could do it in five seconds, you felt comfortable waiting four months and then supplementing after the deadline. You thought that was good enough. We didn't supplement after the deadline. We corrected after the deadline, and, yes, that was good enough, Your Honor. So you corrected. Because we made an error, and we said we were wrong. If they have a point, we give them credit. But I didn't, what took five seconds was the sort on the computer. It didn't take five seconds to go dig this out from our file from the trial we had conducted. I mean, we couldn't do that in seven days. You've heard Mr. Chaffee say there's a local rule in New Jersey that makes you responsible if you disagree with the form of order to come forward and let the court know that. Is he right about that? I don't believe he's right about it. I didn't see, that wasn't briefed, Your Honor. That wasn't what the judge cited. I'm not familiar with that local rule. I'm not familiar with the local rule that says after a judge makes an order and tells you the day your brief is due, you have to come back and make a motion to reconsider that order, otherwise you've waived it. I've never seen a local rule that says that, and I don't believe there's one in the District of New Jersey. Okay. Talking about adequacy of notice. Right. Excuse me, adequacy of representation. This is the issue that Mr. Checkey and Mr. Boyle tried to address by saying what we did for these people who were still subject to the flat ETFs going forward is that we got them prorated. So even though they didn't have a seat at the table or a representative, we got them that relief. That's false because the settlement did not prorate any existing ETFs. Sprint preserved its ability to charge the exact same flat ETF that we proved was illegal in California. After a certain date. Anyone who had anyone who was charged. After a certain date, they could charge again. Sprint had changed its form contract before this settlement was even approved. For new contracts, there was a prorated ETF. That was not part of this settlement. Well, whether it's part of the settlement or not, like take us into the real world of where we are now. Here's what I understand Mr. Boyle and Mr. Checkey to be saying to us. First, as of a date certain, they stopped charging the ETFs on a flat rate basis. That's happened and you can take that as a given. November 2010. Is that an accurate statement? It is. Okay. So we're not talking about some growing number of people are out into the future. It's not growing. And then they say that people who were current customers as of the time of the AMP, they are in the same position as everybody else was if they drop out and they file. They get a prorated benefit like everybody else does. That's what they said, but that's not accurate. Okay. So you're going to have to get real specific. How are they inaccurate in that assertion and what in the record are you relying on like maybe we'll need a 28-J letter or something like with a site for the record that demonstrates that that assertion is false? Because you'd agree, wouldn't you, that that's a pretty big deal? If it's as they say it is and you really are, if you're a real estate broker, then you're in the same boat as everybody else. No, I think I can be very specific by pointing to the circumstances of Ms. Galealos, who's my client. She was charged a flat ETF after this settlement agreement was done because she was on an existing contract that had a flat ETF. The prorated termination fees was for new contracts, new and renewing, but there was a two-year period starting in November 2008 when they changed over to the prorate and continuing for two years thereafter, and it was dwindling because every month some number of customers would either age out of their existing contract or they would renew. There's some kind of donut hole there with people before who don't have a problem and people after the two years who don't have a problem, but your client and the people in that two-year window, they've got the problem. That's exactly right, and my client is right in the middle of that donut hole. And so that's the second clarification I want to make. The third, Your Honor, was Mr. Checkey's discussion of the IAD verdict, and I know that that case is not before this court, but when he's reading from a verdict sheet where there are two important pieces of information missing, one is that Sprint at the end of that trial took a zero on its cross-claim because the jury's verdict in favor of Sprint for $225 million was vacated by the trial judge, and the vacation of that verdict was upheld by the Court of Appeal. The second piece of information that's missing from Mr. Checkey's discussion of that verdict sheet is the judge's ruling that we were awarded $299 million in relief, not 73, because the jury was only asked to rule on the cash component of our damages and was not asked to rule on the overall because there was another $225 million that had been charged but not paid, and we won credit back. We had those charges nullified. So the result of the IAD trial was that we won $299 million on our claim, and Sprint took zero. That's the result we got for one state that represents about 17%, 18% of the country. These fellows are settling nationwide for a much, much smaller amount. Could you say briefly for Mr. Checkey, I think you just heard him. Whether it's Mr. Boyle or Mr. Checkey, I don't care which of them stands out, but thanks, Mr. Burson, for your point. I need to get a specific response to what we have just heard. I understand that you're on. I understand why you're on. The first quote from Judge Linares' opinion in assessing this issue, he said in describing this group of people, for instance, if they are charged in each of these. Where are you reading? I'm sorry. Go to the page site. Page 8 of Judge Linares' opinion approving the final approval. Is there an appendix page sheet? Thank you. For instance, if they are charged in ETF, they would fall into Category 1 or Category 2 class members, depending on whether or not they pay the ETF and would be entitled to the relief provided under such categories, besides the settlement agreement. If they are otherwise harmed because of the existence of a flat rate ETF, such class members would fall into Category 4 class members and would be entitled to the relief afforded therein. Category 4 says any claimant who has a wireless line of service under a term contract entered into before January 1, 2009, so during the time of this flat rate, and is subject to a flat rate ETF that terminates after the close of the notice period, whose approved claim arose after the notice of approval of the settlement and is provided to the settlement class, but before January 1, 2011. I'm completely lost in your lingo. Just tell me, is he talking about the people in the donut hole?